Filed 6/26/14  In re Miranda M. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re Miranda M. et al., Persons Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>Michelle M.,<br><br>Defendant and Appellant. | F067878<br><br>(Stanislaus Super. Ct. Nos. 510632, 510633, 510634)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgments of the Superior Court of Stanislaus County.  Ann Q. Ameral, Judge.

Carolyn S. Hurley, under appointment by the Court of Appeal, for Defendant and Appellant.

John P. Doering, County Counsel, and Robin Gozzo, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

After a long history of drug abuse, appellant Michelle M. (Mother) had her children Jordan, Miranda and Savannah[1] removed from her custody near the outset of the present dependency case. Months later, Jordan was permitted to have an extended overnight visit with Mother that lasted several months. During the extended visit, Jordan (then 5 years old) was found unsupervised and acting out sexually with a young girl under a conference room table. The extended visit was terminated.

Later, at the 18-month review hearing, the dependency court terminated Mother's reunification services as to all three children. The court established long term foster care as the permanent plan for the children.

Mother challenges (1) the termination of Jordan's trial visit; (2) the termination of her services and (3) the court's "failure" to return the children to her at the 18-month review hearing. We affirm.

**FACTS**

*I.  2008 Dependency Proceedings*

A.  The Petition

In January 2008, the Stanislaus County Community Services Agency (the "Agency") filed a Welfare and Institutions Code section 300[2] petition regarding Miranda, Savannah and Jordan.[3] The petition alleged that Mother had admitted using heroin a few

---

[1] In a separate appeal, Miranda and Savannah challenge the sufficiency of the evidence to support the court's refusal to return them to Mother (case No. F067942). As we noted in that case, Miranda and Savannah are two impressive young ladies who have been models of resiliency in the face of adversity.

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[3] Mother has several other children including Brittany S., Brooke S., Rylie M., and A. M.

days before Jordan's birth. Mother had also admitted taking Vicodin and Darvocet in amounts exceeding the prescription.

The petition alleged Tomas G.[4] was Jordan's father, and Fidel M. was Miranda and Savannah's father. It further alleged that Miranda and Savannah had observed domestic violence between Tomas and Mother. Social workers had observed Tomas swing Mother around by her jacket in a parking lot. Mother later reported that Tomas had used his elbow to hit her in the eye, threatened to "choke and kill her if she wasn't quiet," and hit her while she was holding her infant son.

The petition also described Mother's "history of mental health issues" including treatment for bipolar disorder.

Finally, the petition noted that mother had previously "failed reunification with her daughters, Brittany and Brooke [S.]." Brittany and Brooke had been placed under a guardianship in 1997.

B. The Jurisdiction Report

The jurisdiction report emphasized the Agency's concern with Mother's repeated exposure to domestic violence. By February 2008, Mother continued to express a "strong desire to continue her relationship with [Tomas G.] so that the two may be a family." She also advocated for Tomas to be allowed to visit her two older daughters. The social worker concluded that Mother's attitude towards Tomas "does not demonstrate that she is able to make safe choices for herself and for her children."

The court sustained the petition, removed the children from Mother's custody and ordered reunification services. The court ordered that Tomas was not permitted to visit Miranda and Savannah.

---

[4] Because there are numerous variations of the spelling of Tomas G.'s name throughout the record, we rely upon the death certificate issued for the spelling of his name. Outside of quotations, we will use "Tomas" throughout this opinion.

Mother's case plan included domestic violence counseling, psychotropic medication monitoring, mental health services, parenting education, and substance abuse counseling and testing.

C. Interim Review Report – April 29, 2008

By April 2008, Mother was living at a sober living facility called Redwood Family Center (Redwood)[5]. She attended 12-step meetings as required, but "continue[d] to focus on her boyfriend."

D. Further Proceedings

In July 2008, the Agency noted that while Mother had made progress in her substance abuse services, "she has been slow to engage in other areas of her case plan." Nonetheless, the Agency recommended that the children begin trial visits with Mother "as soon as possible." The Agency believed "the level of supervision at Redwood would decrease the risk factors that lead to the removal of the children …."

On July 29, 2008, the court allowed the children to begin a trial visit with Mother, provided Mother remained in a clean and sober environment. The visits were to occur at the discretion of the social worker and Mother was required to allow the social worker into the home at any time.

The children began a trial visit with Mother at Redwood on August 1, 2008. Mother said that Jordan had been getting sick frequently at Redwood. She said that Jordan's illnesses were caused by "the amount of children and germs that permeate[] Redwoods" and requested to be transferred to another sober living facility called Solidarity. At that time, Tomas was living at Solidarity. The social worker believed that Mother's transfer request was, in fact, based on a desire to live with Tomas.

---

[5] This facility is referenced in the record as "Redwood" or "Redwoods." Outside of quotations, we will use "Redwood" throughout this opinion.

4.

On October 28, 2008, the court returned custody of the children to Mother and set a section 364 hearing for January 8, 2009.

Ahead of the January 2009 hearing, the Agency submitted a status review report. Mother was still residing at Redwood and had an appointment "to obtain Section 8 housing." Mother had made limited progress on her domestic violence counseling "due to inconsistent attendance."

The January 8, 2009, hearing was continued to February 11, 2009. At the February hearing, the court ordered family maintenance services to continue.

By July 2009, mother had progressed in some areas of her life and "significantly regressed" in others. She obtained a section 8 voucher and lived with the three children in a "beautiful three bedroom home in a well established area in Modesto." The children were "content in their mother's care," "very bonded to her" and "could not image [*sic*] life without her."

However, Mother had stopped attending her sessions of domestic violence counseling and individual counseling. In June 2009, Tomas contacted Mother and requested to visit with Jordan. Mother knew Tomas was using drugs at the time and possibly had criminal charges pending, yet she still allowed him into the home. She and Tomas then had sex without contraception. Thereafter, Mother began receiving phone calls from another woman saying she was pregnant with Tomas's child.

Mother told the social worker that she did not feel ready for her case to be dismissed. She felt "she had recently made very poor decisions and needs to continue individual and domestic violence counseling."

The court extended services for several months, but eventually dismissed the dependency proceedings on December 10, 2009. Tomas was pronounced dead on April 10, 2012. His death was determined to be caused by a drug overdose.

## II. 2012 Proceedings

### A. Background Facts

On January 2, 2012, Mother and her boyfriend, Michael M., were arrested for robbery. In 2010, Mother had given birth to Michael's daughter, Rylie M. When he and Mother were arrested, Michael asked his adult daughter, Elizabeth, to take Rylie. However, Elizabeth was unable to take the three other children: Miranda, Savannah and Jordan.

On January 4, 2012, the social worker entered the home. Two cases of needles and syringes were found. The home was "filthy," with dirty dishes and dirty laundry on the floor. The children had been living by themselves with no phone or electricity. Miranda, age 15, was caring for her two younger siblings. A neighbor had been "checking" on the children, but worked during the day. Rylie and Savannah had slept at the neighbor's house some nights due to the cold weather.

Savannah told the social worker she had observed Mother and Michael "physically fight" and yell at each other.

The neighbor who had been checking on the children advised that she could not afford to care for the children. The children were initially placed with their former foster parents. Less than two weeks later, the foster parents said they were no longer able to care for the children.

The social worker met with Mother on January 5, 2012. Mother said she had discovered she was pregnant four months prior. Mother claimed she stopped using drugs when she discovered she was pregnant.

The Agency filed a section 300 petition outlining these events and discoveries. The petition also summarized portions of Mother's history with domestic violence and the dependency system. At a contested detention hearing, the court ordered the children detained.

B. February 2012 Report

The Agency prepared a jurisdiction/disposition report in February 2012. The report detailed Michael's extensive criminal history, which spanned from 1984 to 2012 and included convictions for burglary, theft, assault, battery, possession of a controlled substance and unlawful possession of a firearm. Michael reported that he had begun using methamphetamine at the age of 20. He obtained his GED while incarcerated at Folsom Prison.

Mother reported that she began using drugs at the age of 13. She reported using marijuana and "crank."[6] Her drug use "became more regular" after she married Greg S. in 1991. She had two daughters with Greg S., named Brittany and Brooke S. They were removed from her custody after she did not complete a court ordered reunification plan.

Mother said she was currently married to Fidel M., yet the jurisdiction report indicated she was engaged to Michael. Mother had not seen Fidel M. in two years. She was in the process of filing for divorce. Fidel M. was also a drug user.

Miranda was in the ninth grade at the time (2012) and was "doing well academically." The report described her as "bright and articulate." She was "mature for her age" but would become "emotional" when speaking about her situation in foster care.

Savannah was in the eighth grade with "passing grades." The report described her as "angry" and "easily agitated." Jordan and Rylie were not of school age when the report was completed. However, it was noted that Jordan was easily startled by loud noises. Savannah indicated that his reactions were "maybe due to Jordan observing fighting in the home."

Miranda, Savannah and Jordan were placed together in a foster home. Rylie was placed with Michael's adult daughter, Elizabeth.

---

[6] "Crank" is a colloquialism used to reference methamphetamine. (*People v. Balderas* (1985) 41 Cal.3d 144, 162, fn. 4.)

The Agency's assessment was that Mother and Michael "admitted to a recent relapse" but "have provided adequate care to the children for a length of time." The Agency concluded that Mother and Michael had not provided a safe environment for the children since they relapsed. The Agency identified substance abuse as the primary issue Mother and Michael needed to address. The report recommended services for both Mother and Michael.

C.  Jurisdiction/Disposition Hearing – March 21, 2012

At the jurisdiction/disposition hearing on March 21, 2012, some changes were made to the petition, but the core allegations remained. Mother submitted on the petition, as amended. The court adjudged Miranda, Savannah, and Jordan dependents of the court. The court ordered reunification services for Mother and Michael. Mother's case plan included a domestic violence program, individual counseling, and substance abuse testing and assessment.

D.  June 21, 2012, Report

By June 2012, Mother resided at Redwood with her newborn daughter A.[7] A. was a dependent of the court by that time.

Mother reported that she "hates" living at Redwood. The social worker was informed that Mother was "very angry," "combative with everything" and "willing to blame anyone" when she is not "getting her way." The report described mother as ungrateful, entitled and angry.

Mother told the social worker that "the only reason she had CPS in her life was because she stole a bottle of shampoo and also because she was honest with CPS." She said that the security guards who caught her shoplifting "should never have laid hands on her because she was pregnant."

---

[7] The record contains several spellings of Audrie. We will use the spelling "Audrie" throughout this opinion.

The Agency concluded that Mother "appears to be going backward with regards to her program." Mother "expressed that she has done all these services before and that doing them again isn't going to help."

The report recommended that the social worker be granted discretion to permit Mother to have overnight visitation with Jordan, Miranda and Savannah.

E. September 13, 2012, Report

The Agency filed a status review report dated September 13, 2012. The report explained that Mother was still living at Redwood with A. Miranda, Savannah and Jordan had overnight visits with Mother at Redwood.

Mother remained in a relationship with Michael. Mother repeatedly asked for Savannah, Miranda and Jordan to be able to visit Michael in prison. Miranda and Savannah told the social worker that Jordan did not know Michael was in prison.

Miranda and Savannah were offered counseling but refused it. Mother supported their decisions to refuse counseling.

The social worker described the children as "fiercely loyal" to Mother, only sharing "good things" about her. But, the foster parents said they sometimes have to "coax" the girls to visit their mother.

F. Interim Review Hearing – September 13, 2012

At an interim review hearing, the court said it "seems like [M]other is obsessing more over [Michael] than anything else." The court ultimately gave the social worker discretion to permit overnight visits between Mother and the children. The court continued services for Mother.

G. March 6, 2013, Report

The Agency's March 6, 2013, status review report noted that Jordan began an extended trial visit with Mother on September 14, 2012. The social worker observed a decline in Jordan's mood once he returned to his Mother. He had been more happy and

9.

stable in foster care. Mother admitted to having recently "grab[bed] him by the hair." Jordan said he wanted to remain with his mother, but that she yells "a lot."

Mother still remained in a relationship with Michael.

A manager at Redwood conveyed that Mother had had a "complete melt[]down" and appeared to be struggling with depression. Mother had "gone on and off a cocktail of psychotropic medication" and had made "suicidal statements." Mother later said she only made the suicidal statements to get help, but did not truly intend to hurt herself.

The social worker learned that Mother had recently cancelled an individual counseling appointment and failed to attend another.

During one of the social worker's visits to Mother, A. was sick. Mother said she did not have enough formula for A. because she had used her "food stamp money" on Jordan's birthday.

Miranda and Savannah were visiting with their Mother on weekends. They reported that the visits "go well," and they enjoy their visits with Mother.

The report concluded that Mother was "struggling with basic needs for A. such as keeping her up to date on immunizations, ernolling [*sic*] Jordan and A. in the Children's Crisis Center and enrolling Jordan in preschool …."

An addendum report indicated that Mother told the social worker that Michael M. would be released from prison in a "couple months." Mother wondered whether he would be offered services.

On March 6, 2013, the court ordered six more months of services for Mother.

H. Termination of Jordan's Trial Visit

Jordan's trial visit with Mother was terminated on May 2, 2013, because Mother "had been struggling with her own mental health issues, struggling to arrange child care and manager her own services, and not providing adequate parenting and supervision for Jordan."

10.

Mother had been attending counseling with an organization called First Step. A parenting teacher at First Step expressed concern to the social worker about Mother's "lack of supervision" of Jordan. Mother had expressed "sexual concerns" regarding another child at Redwood. Nonetheless, Mother allowed Jordan to have a "slumber party" in the other child's room. After the slumber party, Jordan began "talking about wanting to play the 'humping game.' " Mother also reported that Jordan was trying to "hump" his little sister. Jordan was five years old at the time.

### 1. The Conference Room Table Incident

On April 13, 2013, an emergency response social worker was notified that Jordan was found under a conference room table with his pants and underwear down and another child's mouth "on his privates." Jordan's trial visit with Mother was terminated.

### I. July 19, 2013, Report

In a July 19, 2013, report, the Agency recommended terminating family reunification services to Mother. The report recommended that Miranda, Savannah, and Jordan remain in long term foster care.

The report indicated that Michael M. had been released from prison in May 2013 and eventually admitted to using methamphetamine the day of his release.

On May 9, 2013, a meeting was held at First Step with several of Mother's service providers. The group "brainstormed various living situations and resources for [Mother]." On June 25, 2013, there was another meeting of service providers held at First Step. Mother "appeared very fragile, tearful, beaten down. She expressed feeling overwhelmed and grief[-]stricken regarding Jordan." She did not recall whether she had contacted the various housing options everyone had discussed at the prior meeting on May 9, 2013.

The report concluded that Mother "continues to be unstable with her mental health." The social worker indicated her recommendation was "difficult to make" because some of Mother's "physical and mental health symptoms appear to be outside of

11.

her control." The report also noted that Mother had made some progress with her attitude.

J. August 12, 2013, Report

An interim review report indicated that Mother had attended eight sessions of parental counseling with Aspiranet. A counselor with Aspiranet indicated that Mother "was not productive the first 6 sessions" and was "unable to focus on her son or process information as she was groggy, falling asleep and complained of [v]ertigo." Over the past two sessions, Mother's ability to focus improved. But, Mother failed to do any homework, which included "5 minutes a day practicing the techniques they are working on" and some written assignments. And even during the last two sessions, Mother exhibited an inability to redirect Jordan. The counselor concluded Mother either does not know how to redirect Jordan or "just doesn't want to." When asked if Mother had any strengths, the counselor indicated that during the last two sessions mother was attentive, made eye contact and was nurturing.

A First Step parent educator said that while Mother has improved her ability to multitask, she still struggles with "routines and structure." The parent educator "believed" Mother had made progress and "as long as she stays clean and sober she is capable of raising" Jordan, Rylie and A.

A counselor with Mother's individual counseling provider, Sierra Vista, provided a report. The report indicated that Mother "struggled with attendance." It appeared to the counselor that Mother was over medicated "as evidenced by her head nodding, closed eyes and difficulty concentrating."

The social worker concurred that Mother had an improved ability to focus in July 2013 compared to previous months.

K. Contested 18-Month Review Hearing – August 12, 2013

A contested 18-month review hearing was held on August 12, 2013, and spanned several days. Several people testified at the hearing.

12.

### 1. *Miranda's Testimony*

Miranda testified that she disagreed with the recommendation that she, Savannah and Jordan be placed in long term foster care. Miranda believed her mother could appropriately parent the three children, including herself. Miranda described Jordan as "very rambunctious."

Miranda was asked whether Mother had Jordan "with her" during visits. Miranda testified: "He was sometimes off doing other things, but there is always an adult around somewhere."

Miranda said that Mother gives Jordan rules and "mostly" enforces them. When asked whether her Mother yells "a lot" at Jordan, Miranda testified: "She doesn't yell. She raises her voice in excitement." But, Miranda noted that the volume of her Mother's voice is sometimes the same as yelling.

The court asked Miranda whether there was any need "back in January 2012 to have been removed from" her mother's care. Miranda responded, "Only the fact that she got arrested." Miranda later testified: "I admit our house was dirty, but we were never neglected. We were always clean. We always had food." The court asked whether Miranda felt safe in her Mother's care when she was using drugs and Miranda responded: "I didn't feel in danger."

### 2. *Social Worker Christine Shahbazian's Testimony*

Social worker Christine Shahbazian (Shahbazian) testified that the Agency's recommendation was to terminate services for Mother and place the children in long term foster care.

Shahbazian testified that Mother had not completed her individual counseling case plan component. Mother had begun the counseling in September 2012, "but then had a series of cancelations, no shows, and was placed on hold, and then got back into counseling." Mother had also not completed parent/child interactive therapy. The social worker testified that Mother had completed her domestic violence course.

13.

Shahbazian recounted that Mother had told her Jordan "took off when she was at the bus stop, and she had her other children, so she couldn't run and get him." Shahbazian also testified to the incidents outlined in the status review report involving Jordan's sexual behavior with another child at Redwood. Shahbazian stated that an emergency response social worker had concluded that Mother had not acted "inappropriate[ly]" with respect to supervision of Jordan leading up to the slumber party. But, Ms. Shahbazian testified that the emergency social worker "didn't have all the information." For one, the emergency response social worker did not know that Mother was previously aware of the sexual proclivities of the child with whom Jordan had a slumber party.

Shahbazian said she noticed some improvements when Mother's medication was changed in July 2013. But that did not change the Agency's recommendation because "many times throughout the course of the case" Mother improved temporarily and then "goes downhill."

Shahbazian testified that A. was involved in a different dependency case where the plan was "family maintenance." Shahbazian was also A.'s social worker. The court asked why the Agency recommended that A. remain in Mother's care, but not Miranda, Savannah and Jordan. The social worker responded that Mother's service providers did not express concern over Mother's parenting of A. The court then asked why Miranda and Savannah should not be returned to Mother. The social worker testified that Mother has not demonstrated that she can parent full time and run a household. Moreover, Mother had not "demonstrated stability with her mental health … [or her] ability to complete her individual counseling [and] she has struggled to get various things in place such as child care."

The social worker did not place much weight on the fact that Mother had stayed clean during the dependency proceedings. She stressed that Mother had only stayed clean in a "supported living environment." And when Mother was left to her own

devices after the last dependency case that ended in 2009, she began using drugs again. Mother had told the social worker that she had had a support system after the last dependency case, but "stopped utilizing it."

The social worker said she had not received any reports from Redwood to indicate that Mother was improperly supervising Miranda or Savannah. The social worker did not personally observe any safety concerns with respect to Mother's parenting of Miranda and Savannah at Redwood.

Shahbazian said that after 12 months of services, mother was still struggling to complete the components of her case plan.

### 3. *Mother's Motion*

At the close of the Agency's case-in-chief, Mother's counsel moved for an order returning the three children to Mother. She argued that the Agency had failed to carry its burden to continue separation. The court denied the request. Mother's counsel then called her own witnesses.

### 4. *Mother's Testimony*

Mother testified that she completed counseling with First Step. Mother admitted that when she relapsed and ended up in jail,[8] she "probably needed all of my skills brushed up on at that point." She said she has low self-esteem issues.

Mother claimed she "volunteered" for treatment at Redwood. She was then asked whether the court ordered her to follow all recommendations of drug and alcohol assessment. Mother responded: "I don't remember that, but I'm sure there was."

Mother was asked about the incident at Redwood where Jordan was found under a table engaged in a sex act with a little girl. Mother said she was in an adjacent room moving tables when the incident occurred. Mother was asked: "[I]sn't it true that your

---

[8] Presumably a reference to arrest for shoplifting that triggered the present dependency proceedings.

kids, specifi[cally] Jordan, wasn't [*sic*] taken care of, because there was a lack of supervision on your part; is that correct?" Mother responded, "Yes. That wasn't because of medication. That was because of duties I had to do for Redwoods."

Mother testified that the conference table incident was not the only time Jordan was unsupervised. She said that "[t]here were other times that he would get out of my sight, but either I would go find him or … staff would come and let me know or one of my peers would let me know … where he was."

Mother also testified about the slumber party she allowed Jordan to attend. She said that Jordan did have the slumber party with a child she had been told was "inappropriate." But Mother had thought the slumber party was going to be with another boy, not the "inappropriate" child. Mother admitted it was not a "good choice" to allow Jordan to attend the slumber party.

Initially, Mother testified that Jordan's trial visit should not have been terminated. Later, she testified that "[m]aybe at the time it was a good choice, until I got everything under control … maybe it should have been suspended for a week or two until I got my medications under control. But I don't think he should have been removed from me the way he was."

Mother testified that she taught Jordan his ABCs, colors and how to write. On questioning from the court, Mother admitted that Savannah and Miranda had helped teach Jordan.

Mother said the social worker had started talking to her about enrolling Jordan in Head Start "[s]omewhere around" September 14, 2012. Yet, Mother did not contact Head Start until "[p]robably about January. December or January."

Mother admitted that she had suffered from mental health problems for 15 years. She managed anxiety and depression through medication. Mother would sometimes "go off" her medication when she was using drugs or when she thought she did not need the medication.

16.

Her depression and anxiety worsened when she moved into Redwood. She had recently given birth at the time. Mother was diagnosed with postpartum depression and was prescribed Wellbutrin. She began taking the medication, which "somewhat" helped manage her symptoms.

In January 2013, Mother became "extremely depressed" and told Redwood to call 911. She was hospitalized for three days. While she was in the hospital, Mother's medication was changed, and she was prescribed Remeron and Depakote. The new medications made her "foggy" and put her into a "daze." Thereafter her medication was changed "quite a few times." Mother testified that in March and April 2013 she "think[s]" she was prescribed 12 medications simultaneously. During that timeframe, she "didn't have any feelings" and "everything was at lull [*sic*]." She also had trouble focusing. In June 2013, the doctor reduced Mother's medications to three. Now, Mother feels "alive … focused … not depressed … not anxious." Mother testified that her mental health has been stable for "the last … two or three months, at least."

At the time of the hearing, Mother said she had been "clean" for one year seven months and 20 days. Mother was asked about her drug treatment during the previous dependency case. She testified that after that treatment, she had remained sober for "a year, yeah and a half" before relapsing. Mother said that she is still in a relationship with Michael M. and that she considered him part of her support system. She admitted that Michael M. has a history of substance abuse and had used drugs months earlier. Mother had concerns that Michael M. could be a red flag for her recovery, but said that if Michael M. relapsed, she would break up with him.

Mother testified that she has been aware Miranda and Savannah could not live at Redwood since the day she arrived. Yet, she had only begun looking for alternative housing "[w]ithin the last few months." When asked whether she had been trying to locate alternative housing, Mother said: "Yes and no." She said she could not afford

17.

alternative housing.  Later, Mother testified she was "under the impression" she had to stay at Redwood.

Mother said she applied to become a client of Community Housing and Shelter Services (CHSS), which offered help with deposits for living arrangements.  She was following through with CHSS's application requirements, except she had not yet provided her daughters' social security numbers.  Mother admitted she had received replacement social security cards months ago but "forgot" to provide them to CHSS.

Mother was asked why she had not completed her individual counseling.  She testified that she did not remember why she did not go, initially.  After being "released from the hold"[9] she has been to pretty much all of them, except she "think[s]" she canceled "a few."  On questioning from the court, Mother testified that she knew individual counseling was part of her case plan.  On cross-examination, Mother admitted she missed an appointment on August 14, 2013, *after the 18-month review hearing had begun*.  She missed the appointment because she was getting paperwork together for a different appointment.  She did not call the counselor to cancel because she forgot.  Mother also testified that she missed a counseling session "yesterday," which was August 21, 2013.

Mother testified that if the court returned her children, she would participate in anything she was directed to do.

### 5.  *Offer of Proof re: Vicky Ocaranza*

Mother's counsel made an offer of proof that Vicky Ocaranza would testify that since Mother had her medications adjusted, she appeared sharper and more focused.  Ocaranza would also have testified that Jordan appears happy around Mother, when picked up for "community visits."  Additionally, Mother supervised Jordan appropriately

---

[9] This is apparently a reference to the counseling center's procedure when an individual repeatedly fails to make appointments.

during community visits. During the first community visit, Jordan wanted to leave and would not listen to Mother. Since then, Jordan was well behaved. The court and all counsel "accept[ed]" the offer of proof.

### 6. Rene Pirie

Rene Pirie was a case manager at Redwood, responsible for one-on-one counseling, assessments and "a lot of overall supervision of the facility." Pirie said she observed Mother with her children between January and April 2013. Pirie testified that her observations caused her to become concerned with the lack of supervision of Mother's children at Redwood. Pirie was asked whether that concern applied to all of the children or only to specific children. Pirie responded that her concern applied to "all of the children." However, Pirie later testified that she did not have concerns regarding the supervision of Miranda and Savannah. Instead, her concerns were limited to the "younger three children" (presumably referring to Jordan, Rylie and A.). Sometimes, Pirie would see one of the younger children unsupervised. Pirie would go inform Mother the children were unsupervised. Mother would respond by asking where the child was and then retrieve him or her.

Pirie testified that since Mother's medication was changed, she does not see Mother "walking around sleepy all the time." Since May 2013, Mother makes sure that someone watches Rylie and A. when she is not with them.

Pirie "felt" Mother was a "good parent" to Jordan. Pirie had not seen Mother with Jordan since the end of May 2013. She thought Mother's parenting of Miranda and Savannah was "[e]xcellent."

### 7. Paula McDowell

Redwood's program manager, Paula McDowell, also testified. McDowell said that sometimes she would have to tell Mother, "Come get [A.]. She's up front. Come get Rylie." McDowell said Mother "has gotten a lot better," but there were still times when

19.

Mother would have to come get A. McDowell testified that just "last week," A. was in her office unsupervised.

McDowell noticed a change in Mother's affect when her medication was changed in June 2013. She would no longer be "spacing off" or "waking up in the middle of the night." Before the change in medication, Redwood staff would tell McDowell that Mother would be up in the middle of the night, walking around the facility.

McDowell believed Mother could safely parent her children.

### 8. *Court's Ruling*

At the conclusion of the contested 18-month review hearing, the court terminated reunification services, refused to return Jordan, Savannah and Miranda to Mother's custody, and set the permanent plan for the children to be long term foster care. The court emphasized its concern with Mother's mental health issues and her relationship with Michael M. The court also expressed it was "very concerning" that Mother had not completed her individual counseling.

## DISCUSSION

Mother raises several issues on appeal. She argues that various orders regarding Jordan's trial visit (including the order permitting termination of the trial visit) should have been preceded by notice and a hearing under section 387. Mother also submits that the court erroneously failed to return the children to her custody and to extend services at the 18-month review hearing.

## I. *SECTION 387 DOES NOT APPLY TO TERMINATION OF A TRIAL VISIT*

Mother contends that Jordan was removed from her custody after the conference room table incident without notice and a hearing as purportedly required by section 387. That statute establishes several procedural requirements that must precede any order "removing a child from the physical custody of a parent.…" (§ 387, subd. (a).)

Mother's argument falters in its premise that the termination of a trial visit constituted a removal of Jordan from her "physical custody" as that phrase is used in

20.

section 387. Jordan was removed from Mother's custody at the beginning of the dependency proceedings, well before the termination of the trial visit. Thereafter, the Department, pursuant to the court's order, permitted Jordan to have an extended overnight visitation with Mother. That extended visit was terminated when Jordan was found engaged in a sexual act with a young girl. Thus, what happened here was the termination of an extended visit, not the removal of Jordan from Mother's "physical custody." Therefore, section 387 did not apply.

If we were to accept Mother's view, section 387 would apply every time the Department wanted to end a dependent child's unsupervised visit to the parent's home; even if the visit only lasted a few hours.

Mother tries to avoid this consequence by suggesting that the trial visit here was akin to returning Jordan to Mother's physical custody due to its extended length. But accepting this argument would be inconsistent with our prior cases holding that visitation orders "need not specify the frequency and length of visits." (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1009.) To adopt Mother's position would be to hold that visitation orders must provide for sufficiently brief visitations or risk being construed as a custody removal order under section 387. Given the dependency statutes' distinction between a visitation order (see § 362.1, subd. (a)(1)) and a removal order (see § 387), it would be anomalous for us to hold that one transforms into the other on a judicially created timeframe. If the Legislature desired to extend section 387's protections to the termination of a lengthy in-home visit, it could have easily done so explicitly.

Cases upon which Mother relies, including *In re Damonte A.* (1997) 57 Cal.App.4th 894 and *In re Andres G.* (1998) 64 Cal.App.4th 476 are distinguishable. In both of those cases, the court "removed" the children from the physical custody of the parents in name only, because the children were immediately placed back with them. This "artifice" troubled the *Andres G.* court, which said:

21.

"We are troubled by, what at least appears to be, the artifice of making a finding that it is necessary to remove a child from the physical custody of the parents, and, thus, place custody with Department, and then immediately place the child physically back in the home. Not only does such a procedure entail an unseemly inconsistency, its effect is to either remove children from the home under circumstances the Legislature did not authorize or to place children in a dangerous setting." (*In re Andres G.*, *supra*, at p. 481.)

In other words, the appellate court was troubled by the dependency court placing children with their parents while, in the same breath, saying that very placement poses a substantial danger to the children. (See § 361, subd. (c)(1).) Here, there is no such "artifice" entailing the "unseemly inconsistency" (*In re Andres G.*, *supra*, 64 Cal.App.4th at p. 481) with which *Andres G.* was concerned. Rather this case presents the entirely common circumstance of a dependency court removing children from their parent's custody and then, at a future date, permitting visitation. The dependency court removed Jordan from Mother's custody on February 1, 2012, at the beginning of the case. It was not until months later, in June 2012, that the court permitted overnight visitation between Mother and Jordan. Thus, the cases relied on by Mother are distinguishable.

## II. WE AFFIRM THE COURT'S ORDER DECLINING TO (1) RETURN THE CHILDREN TO MOTHER AT THE 18-MONTH REVIEW HEARING AND (2) EXTEND SERVICES TO MOTHER

"At … 18-month review hearings the juvenile court must return the child to the custody of the parent unless it determines, by a preponderance of the evidence, that return of the child would create a substantial risk of detriment to the child's physical or emotional well-being. [Citations.]" (*In re Marilyn H.* (1993) 5 Cal.4th 295, 308.) Here, the dependency court found that a substantial risk of detriment to all three children's physical and emotional wellbeing existed. Therefore, the court did not return the children to Mother's custody.

In dependency court, the Agency bears the burden of establishing substantial risk of detriment. (§ 366.22, subd. (a).) On appeal, we review the dependency court's finding

for substantial evidence. (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 705 (*Constance K.*).)

" 'Evidence sufficient to support the court's finding "must be 'reasonable in nature, credible, and of solid value; it must actually be "substantial" proof of the essentials which the law requires in a particular case.' " [Citation.] "Where, as here, a discretionary power is inherently or by express statute vested in the trial judge, his or her exercise of that wide discretion must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]" [Citations.]' [Citations.] In the presence of substantial evidence, appellate [courts] are without the power to reweigh conflicting evidence and alter a dependency court determination. [Citations.]" (*Constance K.*, *supra*, 61 Cal.App.4th at p. 705, italics removed.)

We conclude that substantial evidence supports the dependency court's determination that the children would face a substantial risk of detriment if returned to Mother. First, there was substantial evidence that Mother failed to participate regularly and make substantive progress in multiple court-ordered treatment programs. (See § 366.22, subd. (a).) Second, there was substantial evidence that Mother maintained her relationship with Michael M., despite the risk of detriment he poses. (See *Constance K.*, *supra*, 61 Cal.App.4th at pp. 704–705.) We detail this evidence below.[10]

    A. Evidence of Mother's Failure to Regularly Participate and Substantively Progress in her Court-Ordered Treatment Programs

        *1. Individual Counseling (Sierra Vista)*

"The failure of the parent … to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (§ 366.22, subd. (a).) " 'In determining whether it would be

---

**10** This evidence also defeats Mother's claim that the court erroneously terminated her services.

detrimental to return the child at the 18-month review, the court must consider … the "extent" to which the parent "cooperated and availed himself or herself of services provided." [Citation.]' [Citation.]" (*Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1341.)

Here, there was substantial evidence that Mother failed to participate regularly in her individual counseling with Sierra Vista. Mother canceled or was a "no show" for at least eight counseling sessions. Mother even missed two individual counseling sessions after the contested hearing had begun. Thus, there is substantial evidence Mother failed to "participate regularly" in her individual counseling. (See § 366.26, subd. (a).)

Given Mother's history of mental health issues, her failure to regularly participate in individual counseling is significant. As recently as January 2013, Mother was hospitalized for three days due to what she called "extreme[]" depression. One of the express goals of the individual counseling was to help Mother "address past issues of physical/sexual abuse." Yet, despite the serious consequences of her depression as demonstrated by her hospitalization, Mother failed to regularly participate in the services designed to help her address issues potentially underlying her depression.

Additionally, the counseling was intended to help Mother "set appropriate boundaries with people." Mother has an extensive history of using drugs with her boyfriends. Given that history, Mother's failure to fully participate in individual counseling is especially troubling.

### 2. Parental Counseling (Aspiranet)

Moreover, there was substantial evidence that Mother failed to make substantive progress in her parental counseling with Aspiranet. The first six sessions were unproductive because Mother could not focus and was even falling asleep. Mother claimed the lack of progress was due to medication she was taking. But that does not explain the subsequent two sessions where Mother was able to focus, yet still unable to apply the concepts she was being taught. Moreover, Mother failed to do "any" of the

homework assigned in counseling, which included five minutes per day of practicing parenting techniques and written work.  In sum, there was substantial evidence that Mother failed to "make substantive progress" in the parental counseling program.  (See § 366.22, subd. (a).)

### 3. *Mother's Choice to Maintain her Relationship With Michael M.*

"At the section 366.22 hearing, a trial judge can consider, among other things … whether the natural parent maintains relationships with persons whose presence will be detrimental to the ward .…" (*Constance K., supra*, 61 Cal.App.4th at pp. 704–705.)

Mother has an extensive history of involving herself with destructive men. Tomas G., Fidel M., and Michael M. were all drug users.  Mother and Michael M. used drugs together extensively in 2011.  Michael M. used drugs at least as recently as May 4, 2013 – the day he was released from prison.  Despite Michael M.'s failure to rehabilitate and her own history of dependence on drugs and drug-users, Mother remained in a romantic relationship with Michael M. throughout the dependency case.  She even considered him to be part of her support system.  In sum, there was substantial evidence Mother is maintaining a relationship with a "person[] whose presence will be detrimental .…" (*Constance K.*, *supra*, 61 Cal.App.4th at p. 705.)

### 4. *Mother's Contentions do not Alter the Import of the Evidence Cited Above*

Because there was substantial evidence to support the dependency court's determination, Mother's citation to other, more favorable evidence is unavailing.  "In the presence of substantial evidence, appellate justices are without the power to reweigh conflicting evidence and alter a dependency court determination.  [Citations.]" (*Constance K.*, *supra*, 61 Cal.App.4th at p. 705.)  Nonetheless, we will briefly address Mother's various contentions.

Mother takes exception with the dependency court findings regarding Mother's poor supervision of Jordan.  Specifically, in reference to the slumber party incident, she

25.

argues "[t]he court's statements that the mother exposed her child to children who act out sexually is not fair to the mother." We disagree. Mother argues that she "really has no way of knowing with certainty what will happen if she lets any one person watch her children." No parents ever know with certainty what will happen to their children in a given situation. So, parents must make reasoned judgments from the information they have. Here, there was evidence that Mother had "sexual concerns" about the other child *before* the slumber party. Yet, Jordan was allowed to have the sleepover. The next day, he told his Mother he wanted to play the "humping game." The dependency court was free to conclude that it was poor judgment for Mother to allow Jordan to have a sleepover with a child for whom she had "sexual concerns," even though she could not have known with certainty that anything unfortunate would happen.[11]

Mother also argues that it was not foreseeable that children as young as four and five would act out sexually. But the point is Jordan should not have been exposed to the consequences of inadequate supervision, regardless of whether any particular consequence was foreseeable or not. Parents rarely, if ever, know what the precise consequences of inadequate supervision will be. That is why the failure to supervise young children is so serious; it exposes them to dangers, both known and unknown. Such a failure may be considered by a dependency court.

With respect to the conference room table incident, Mother points to her own testimony that she was "only outside for 20 seconds" when the incident occurred. But Mother fails to address the fact that the dependency court found Mother's claim that she was outside for only 20 seconds not credible. As an appellate court, "[w]e do not pass on

---

[11] If anything, the fact that Mother did not know "with certainty" what would happen at the sleepover is detrimental to her position. Not knowing what will happen is a strong reason not to let your child have a sleepover with another child for whom you have "sexual concerns."

the credibility of witnesses." (*In re Megan S.* (2002) 104 Cal.App.4th 247, 251.) As a result, we will not disturb the court's credibility determination on this issue.

Mother also argues that regardless of prior incidents, she now ensures appropriate supervision of her children. But at the hearing, the director of Redwoods said that sometime *after* May 2, 2013, Mother asked whether one of her peers should watch her child. The director believed Mother should have already known that the specific peer in question would not be an appropriate babysitter. Mother responds to this evidence by arguing: "That the mother was not aware of some fact about a women [*sic*] is not evidence of a substantial risk of detriment." But the evidence showed that Mother *was* aware of the pertinent facts regarding this particular peer and why they would not be an appropriate babysitter. The director of Redwoods testified that Mother's babysitting inquiry was inappropriate because "[p]reviously at a meeting before that we talked about the supervision of her children and then a situation that happened with that other client and their children." The director also testified: "And there was already red flags and stuff. So for her to ask for that mom to watch her child … shouldn't have been asked, I felt."

Mother also argues that "much was made" of her reported inability to redirect Jordan at the Aspiranet parental counseling. To the extent Mother is claiming the dependency court's decision was largely based on her inability to apply certain concepts in parental counseling, we disagree.[12] The court mentioned the issue very briefly in its

---

[12] Mother's citation to *David B. v. Superior Court* (2004) 123 Cal.App.4th 768 is unpersuasive. That decision rightly noted that we are concerned with a parent's grasp of "important parenting concepts – things such as a child's need for security, adequate nutrition and shelter, freedom from violence, proper sanitation, healthcare, and education." (*Id.* at p. 790.) Thus, if the dependency court here had based its decision entirely on Mother's inability to "redirect" Jordan at counseling, we would likely find error. But that is not what happened. The court had several appropriate bases for its ruling beyond Mother's inability to apply concepts learned at parental counseling, as we have explained.

ruling. But even if the court had placed additional weight on this issue, there was a statutory basis for doing so. Section 366.22, subdivision (a) provides that "[t]he failure of the parent … to participate regularly *and make substantive progress* in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (§ 366.22, subd. (a), italics added.) Therefore, the dependency court could consider this because it tended to show Mother was failing to "make substantive progress" (§ 366.22, subd. (a)) in parental counseling.

Mother emphasizes the fact that she remained sober through the latest dependency case. This was undoubtedly a positive development and the dependency court commended her for it. But Mother faults the court for relying on her "past to speculate that it could recur in the future." Mother notes that " '[p]revious acts of neglect, standing alone, do not establish a substantial risk of harm; there must be some reason beyond mere speculation to believe they will reoccur. [Citations].' [Citation.]" (*In re David M.* (2005) 134 Cal.App.4th 822, 831–832.) But here, there were reasons beyond speculation to believe Mother's drug use would reoccur. Though Mother remained sober during this dependency case and made some progress in some services, the same could be said of the previous dependency case. Yet, she relapsed within one or two years. Moreover, Mother had repeatedly used drugs with her boyfriends in her past. Moreover, she remained in a relationship with Michael M. through the contested hearing; the same Michael M. who had recently used drugs on the very day he was released from prison. The dependency court was free to conclude that Mother's current sobriety and progress with some portions of her case plan were not incompatible with a finding of substantial risk of detriment.

Additionally, the dependency court was free to discount Miranda's and Savannah's claims that they desired reunification. The court could have believed they were simply saying what they knew Mother wanted to hear. Miranda's refusal to acknowledge some of Mother's more obvious shortcomings supports such an inference.

28.

For example, Miranda was asked whether there was any reason for the children to have been removed from Mother at the beginning of the case in January 2012. Miranda responded, "Only the fact that she got arrested."

Moreover, the social worker had described Miranda and Savannah in a report as "fiercely loyal" to Mother, only willing to share "good things" about her. And, though the girls claimed they wanted to be with Mother, their foster parents said they sometimes had to "coax" the girls to visit Mother. In sum, the dependency court was free to place less weight on Miranda and Savannah's statements. The dependency court was also free to conclude that the girls' desires, though entitled to full weight, were outweighed by the countervailing considerations. Either way, we will not disturb the court's conclusion.

## DISPOSITION

The judgments are affirmed.

_____
Poochigian, J.

WE CONCUR:


_____
Cornell, Acting P.J.


_____
Gomes, J.

29.